**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

-----------------------------------------------------------------x

DANIEL ZIMMERMAN,                          :

               Plaintiff,                        :

   -against-                                     :       Case No.

B PLUS E LLC,                              :

               Defendant.                      :

-----------------------------------------------------------------x

## COMPLAINT

Plaintiff Daniel Zimmerman, by his undersigned counsel, as and for his Complaint herein, respectfully alleges as follows:

**Nature of the Dispute**

1. This Complaint is brought by Plaintiff Daniel Zimmerman ("Zimmerman") against his former employer, B Plus E LLC (also known as "B+E" or "Brokers + Engineers" and referred to herein as "B+E"), for B+E's breach of its employment contract with Zimmerman and for B+E's unjust enrichment as a result of work done by Zimmerman. In contravention of its contractual obligations, B+E has failed to pay Zimmerman the full amount of commissions he earned while employed by B+E as a commercial real estate broker. Although Zimmerman procured the largest deal in B+E's history, which generated an initial gross commission in excess of $2 million dollars and additional follow-on commissions of hundreds of thousands of dollars, of which Zimmerman was contractually entitled to 50% (and

of which B+E was entitled to the other 50%), B+E abused its position as Zimmerman's employer by helping itself to hundreds of thousands of dollars which it simply took from Zimmerman's portion of the commissions. B+E has also unjustly enriched itself by terminating its relationship with Zimmerman to improperly retain commissions conferred upon B+E as a direct result of Zimmerman's efforts and which would have otherwise been payable to Zimmerman. These willful appropriations by B+E violated the parties' contract and traditional principles of equity.

## Parties, Jurisdiction and Venue

2. Plaintiff Zimmerman is, and at all times relevant to this action was, a citizen of the State of New York. Zimmerman is an experienced commercial real estate broker who specializes in the origination and negotiation of sale and leaseback transactions and other single-tenant transactions.

3. Upon information and belief, Defendant B+E is, and at all times relevant to this action was, a limited liability corporation organized under the laws of the State of Florida. Defendant B+E's principal place of business is located within this District at 2303 North Florida Avenue, Tampa, Florida 33602. On its website, B+E describes itself as "a modern investment brokerage firm, specializing in net lease real estate and 1031 exchanges" that "help[s] clients buy and sell single tenant real estate."

4. This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332(a) as it is a civil action between citizens of different states, wherein the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), as Defendant B+E is a resident of this District; and additionally, because the parties to this action entered into a written employment contract specifying that any dispute arising out of or relating to that contract, as this action does, would be litigated in this District.

### Statement of Facts

6. Pursuant to a written employment contract dated January 30, 2018, and signed by Zimmerman the following day (the "Employment Contract," attached hereto as Exhibit A and incorporated by reference in this complaint), B+E hired Zimmerman as a Director in B+E's New York office. His job was the "[o]rigination and execution of net lease real estate business for the Company." The Employment Contract specified that "You [Zimmerman] will receive no salary, and your compensation will be based solely on commissions . . . ." The Employment Contract further stated that **"At B+E, gross commissions are split 50/50 between the Company and the broker."** (emphasis added)

7. At the time that the Employment Contract was entered into, and continuously throughout the duration of Zimmerman's employment, B+E maintained a "Company Handbook." The Employment Contract stated that Zimmerman's employment with B+E would be governed by the policies and procedures of the Company Handbook. With respect to the commission schedule applicable to B+E brokers like Zimmerman, the Company Handbook (a/k/a the "Broker Policy and Procedures Manual"), in a section entitled "Income Policy and Procedures," states:

> Corporate Splits. B+E believes in transparent Brokerage split across all Brokers. **B+E splits income 50-50 with its Brokers, and in return the Company provides the Broker with a higher level of support and**

> **technology than other Brokerage firms. This split never changes regardless of tenure or performance.** (emphasis added)

See Exhibit B, Company Handbook Excerpt.

8. The Employment Contract and the Company Handbook referred to therein are the only documents executed by the parties that govern how Zimmerman's commissions would be calculated.

9. Zimmerman's specialty was and is the origination and negotiation of "sale and leaseback" transactions. In the context relevant to this case, these transactions can arise when a company owns retail stores that have value as real estate which the company wishes to monetize while continuing to occupy and use the store for purposes of retail sales. In such a situation, a broker like Zimmerman, based on his knowledge and relationships with such companies developed over the course of many years, might propose to such a company a sale and leaseback transaction whereby the company would sell one or more retail stores to a buyer, and then lease the store back from the buyer.

10. Zimmerman had a long-standing relationship that he developed over the years with a large retail company that will be referred to herein as "BP."[1] BP is a retailer with many stores located throughout the United States.

11. While employed by B+E pursuant to the Employment Contract, Zimmerman originated and executed an approximately $325 million sale and leaseback transaction that

---

[1] A pseudonym has been employed to avoid public disclosure of BP's confidential business dealings. BP is a non-party whose identity is not germane to the merits of Zimmerman's claims.

closed in mid-2019 involving eleven BP stores (the "BP Deal"). Upon information and belief, the BP Deal was and remains the single largest transaction ever executed by B+E.

12.     The gross commission payable to B+E on the BP Deal was approximately $2,185,625. Accordingly, the 50% share of the commission that was payable to Zimmerman pursuant to the express terms of the Employment Contract was $1,092,812.

13.     Instead of paying the amount due Zimmerman from the BP Deal in full, B+E's co-founder, principal owner, and CEO Camille Renshaw ("Renshaw"), informed Zimmerman that a quarter of Zimmerman's 50% share of the gross commission, or $273,203, would be withheld from him by B+E, and paid to Renshaw and her co-founder, co-owner, and B+E President, Scott Scurich ("Scurich") instead.

14.     Renshaw, in her capacity as B+E's CEO, informed Zimmerman that she was taking this money from Zimmerman for herself and Scurich because of the purported time and effort she had put into the transaction and because Scurich was her partner, even though Zimmerman had originated the transaction, worked on it, and was contractually entitled to half of the gross commission under the Employment Contract irrespective of any time or effort Renshaw purportedly spent on the transaction.

15.     In fact, Renshaw had not expended any unusual or even significant time on this transaction. But much more significantly, whatever time and effort she and/or B+E had put into the transaction was already fully accounted for by virtue of B+E's 50% share of the gross commission as agreed in the Employment Contract. As B+E itself stated in its Company Handbook, "B+E splits income 50-50 with its brokers, *and in return* the Company provides the Broker with a higher level of support and technology than other brokerage firms. This split

*never changes* regardless of tenure or performance." (emphasis added). Despite the fact that B+E and Renshaw would be fully compensated by their contractually specified 50% of the gross commission, for whatever Renshaw claimed to have done to assist with the execution of the transaction in question, she, on behalf of B+E and herself, unilaterally dictated that Zimmerman's share would be reduced by 25%, or $273,203.

16. B+E incurred almost no expense directly relating to its employment of Zimmerman. B+E did not pay Zimmerman a salary. For a brief period at the outset of his employment, Zimmerman received a draw against his future commissions that he soon repaid in full. B+E did not provide Zimmerman with health insurance or similar benefits, and Zimmerman even paid his own phone bill. Zimmerman mostly worked out of his home, and sometimes at a desk in B+E's New York office that was otherwise occupied by Renshaw's administrative assistant. Zimmerman was completely dependent upon, and entitled to, his contractually-promised commission earnings.

17. When Zimmerman complained to Renshaw about the underpayment of his 50% share of the gross commission on the eleven-store BP Deal, Renshaw attempted to placate Zimmerman by assuring him B+E would make up the shortfall by giving him stock in B+E. Renshaw and B+E never followed through on this assurance and Zimmerman never received any B+E stock in lieu of the unpaid commissions.

18. Zimmerman did not immediately quit and sue B+E to recover the underpayment to which he was contractually entitled because he did not wish to risk the possibility that he would receive none of the moneys owed to him until the conclusion of litigation with B+E. Despite the underpayment, the portion of the commissions that B+E did agree to pay was still

a large sum that Zimmerman could ill afford to wait for. Further, because of Renshaw's promise to make up for the underpayment to Zimmerman with stock in B+E, Zimmerman was induced to believe he would eventually receive equivalent value for the unpaid commissions.

19. Zimmerman was also deterred from immediately quitting and suing B+E for the underpayment to which he was contractually entitled because three follow-on transactions stemming from the BP Deal were imminent. Specifically, the buyer from the BP Deal planned to quickly sell three of the eleven properties acquired in that deal.

20. As the originator of these follow-on transactions, Zimmerman would be and was entitled to receive 50% of the gross commissions payable to B+E from those three sales pursuant to the Employment Contract. Understandably, Zimmerman did not want to jeopardize receipt of the substantial commissions that would be due him on the three follow-on sales, and he resolved to stay at B+E with the hope that Renshaw would make good on her assurance to compensate Zimmerman with B+E stock.

21. Zimmerman's hopes were dashed, however, when the first follow-on transaction, which was the sale of a retail store located in Hamburg, PA, closed in the fall of 2019. Zimmerman was not only the originator of the Hamburg, PA transaction by way of procuring the BP Deal, but he also procured the buyer for this property. Having become emboldened by its appropriation of 25% of the commission that was due to Zimmerman on the BP Deal, however, B+E decided to improperly take an even larger share of Zimmerman's commissions from the Hamburg, PA transaction.

22. Renshaw informed Zimmerman that with respect to the Hamburg, PA transaction, which generated a gross commission of $552,180, Zimmerman's 50% share

($276,090) was being cut in half.  Thus, the "50-50" split that supposedly "never changes" according to the Company Handbook, now became 75-25 in B+E's favor.  In paying Zimmerman only half of the amount he was due, B+E deprived him of $138,045 that he was clearly owed under the Employment Contract.

23. The second follow-on transaction arising out of the BP Deal was the sale of a retail store in Mitchell, SD.  Once again, Zimmerman was not only the originator of this transaction by way of procuring the BP Deal, but he also found the buyer of the Mitchell SD property.

24. Relations between Renshaw and Zimmerman became increasingly strained as a result of B+E's failure to pay the entire commissions due Zimmerman on the BP Deal and on the Hamburg, PA transaction.  As the Mitchell, SD transaction was about to close in late 2019, Renshaw constructively discharged Zimmerman by cutting off his access to B+E's systems.  B+E did this to intentionally deprive Zimmerman of the 50% share of the gross commission to which he would be contractually entitled on the Mitchell, SD transaction.

25. B+E forced the termination of Zimmerman's employment through its refusal to pay him the full amount of the commissions to which he was contractually entitled, by misappropriating Zimmerman's commissions for its own benefit, and by shutting off his access to B+E's systems.  Zimmerman's termination should thus be regarded as a constructive discharge; and/or as an event deliberately engineered by B+E to frustrate Zimmerman's receipt of the fruits of the Employment Contract that the parties had entered into, and which Zimmerman had faithfully performed in all material respects.

26. B+E has paid Zimmerman nothing from the Mitchell, SD transaction. Upon information and belief, the gross commission paid to B+E as a result of Zimmerman's work to secure this transaction was approximately $200,000.[2] Pursuant to the Employment Contract, 50% of this gross commission was payable to Zimmerman had B+E not constructively discharged Zimmerman. B+E has knowingly and voluntarily retained the portion of the commission that would have been payable to Zimmerman had it not constructively discharged him. B+E's constructive discharge of Zimmerman and subsequent retention of the entire commission generated from his efforts to secure the Mitchell, SD transaction is inequitable.

27. A third follow-on sale arising out of the BP Deal involved a retail store located in Leeds, AL. Although Zimmerman was forced out of his employment with B+E before this transaction could be completed, because he was the originator and procuring cause of the transaction, 50% of the gross commission from that transaction would also have been payable to Zimmerman under the Employment Contract had B+E not constructively discharged him. Upon information and belief, the gross commission from this sale is or will be similar to that of the Mitchell, SD transaction. To date B+E has paid Zimmerman nothing from the Leeds, AL transaction he originated. To the extent B+E has received the commission from the Leeds, AL transaction, it has knowingly and voluntarily retained the portion of the commission that was payable to Zimmerman before it constructively discharged him. B+E's constructive discharge of Zimmerman and subsequent retention of the entire commission generated from his efforts to secure the Leeds, AL transaction is inequitable.

---

[2] The precise amount of the gross commissions is to be determined in discovery.

28. B+E's actions, in depriving Zimmerman of the full commissions to which he was contractually and/or equitably entitled, were a willful, bad faith exercise of raw power that were taken with full knowledge that the terms of the Employment Contract specified that Zimmerman was entitled to 50% of the gross commissions.

## First Cause of Action
## Breach of Contract

29. Plaintiff repeats and realleges Paragraphs 1 through 28 as though fully set forth herein.

30. By failing to pay Zimmerman the full commissions that he was owed from the BP Deal, and the Hamburg, PA transaction, B+E committed a breach of its Employment Contract with Zimmerman.

31. By reason of the foregoing, Zimmerman has sustained damages in an amount in excess of $410,000, consisting of $272,203 in unpaid commissions from the BP Deal, and $138,045 in unpaid commissions from the Hamburg PA transaction.

32. Pursuant to the terms of the Employment Contract, Zimmerman is entitled to recover his attorneys' fees and expenses incurred as a result of B+E's breach of contract.

## Second Cause of Action
## Breach of the Implied Covenant of Good Faith and Fair Dealing

33. Plaintiff repeats and realleges Paragraphs 1 through 28 as though fully set forth herein.

34. The Employment Contract, like all contracts, is subject to an implied covenant of good faith and fair dealing on the part of both parties thereto, pursuant to which each party

covenants to the other that he or it will not take any steps to deprive the other of the full fruits and benefits of their agreement.

35. By exercising its power (as distinct from its right, which it lacked) as Zimmerman's employer to withhold full payment of his commissions, to cut off Zimmerman's access to B+E's systems, and to force him out of B+E's employment prior to the closing of the Mitchell, SD and Leeds, AL transactions, B+E violated the implied covenant of good faith and fair dealing appurtenant to the Employment Contract.

36. By reason of the foregoing, Zimmerman has been deprived of commissions to which he would have been entitled but for B+E's misconduct, and has sustained damages of – upon information and belief – approximately $200,000 ($100,000 with respect to each of the Mitchell, SD transaction and the Leeds, AL transaction), the precise amounts to be determined in discovery and/or proven at trial.

**Third Cause of Action
Unjust Enrichment**

37. Plaintiff repeats and realleges Paragraphs 1 through 28 hereof as though fully set forth herein.

38. As a result of his originating and procuring the Mitchell, SD and Leeds, AL transactions for B+E, Zimmerman has conferred upon B+E the entire commissions arising from those transactions.

39. B+E knows that the commissions it has received from the Mitchell, SD and Leeds, AL transactions were conferred upon it as a result of Zimmerman's efforts. B+E has accepted and retained the full amount of these commissions, including the portion of such

commissions (50%) that would have been payable to Zimmerman under the Employment Contract.

40.   Under the circumstances, it would be inequitable for B+E to retain the full commissions earned from the Mitchell, SD and Leeds, AL transactions having constructively discharged Zimmerman after he originated the deals.  B+E would not have received any such commissions but for Zimmerman's efforts, which he undertook with the express belief that he would receive 50% of such commissions pursuant to the Employment Contract.  Equity demands that B+E be required to pay Zimmerman the 50% of the commissions to which he would have been entitled for originating these two transactions.  The precise amounts of such commissions are to be determined in discovery and/or proven at trial.

WHEREFORE, Plaintiff Daniel Zimmerman demands judgment against Defendant B Plus E LLC as follows:

a. Pursuant to the First Cause of Action, for damages in excess of $410,000, the precise amount to be determined in discovery and/or proven at trial;

b. Pursuant to the Second Cause of Action, for damages in excess of $200,000, the precise amount to be determined in discovery and/or proven at trial;

c. Pursuant to the Third Cause of Action, for damages in excess of $200,000, the precise amount to be determined in discovery and/or proven at trial;

d. For its costs of this action, including reasonable attorneys' fees;

e. For prejudgment and post-judgment interest in accordance with law; and

f. For such other and further relief as the Court deems just and proper.

Respectfully submitted,

*/s/Robert K. Jamieson*
Robert K. Jamieson,
Florida Bar Number: 0072018
WIAND GUERRA KING P.A.
5505 West Gray Street
Tampa, FL 33609
Tel: (813) 347-5110
rjamieson@wiandlaw.com

*/s/ Lloyd S. Clareman*
Lloyd S. Clareman (Trial Counsel)
New York Bar Number: 1077080
*Pro Hac Vice Motion Forthcoming*
121 East 61st Street
New York, New York, 10065
Tel: (212) 751-1585
lloyd.clareman@clareman.com

*Counsel for Plaintiff*

Tampa, Florida
Dated: April 24, 2020