UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DANIEL ZIMMERMAN,

        Plaintiff,

Case No. 8:20-cv-00948-KKM-CPT

v.

B PLUS E, LLC,
a Florida Limited Liability Company,

        Defendant.
_____/

### DEFENDANT B PLUS E, LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF DEFENDANT'S EXPERT WITNESS

Defendant, B PLUS E, LLC ("B+E"), by and through its undersigned counsel, and pursuant to the applicable Federal Rules of Civil Procedure and M.D. Fla. L.R. 3.01(c), hereby files this Response in Opposition to Plaintiff's Motion in Limine to Exclude the Testimony of Defendant's Expert Witness [D.E. 73], and in support thereof, states as follows:

### I.    INTRODUCTION

Plaintiff's motion in limine[1] to exclude the testimony of Defendant's expert witness [D.E. 73] can best be described – to quote Magistrate Judge Edwin G. Torres

---

[1] Plaintiff's motion in limine purported that B+E's expert disclosures did not comply with the Court's scheduling order (which B+E patently denies). Rather than filing any motions or scheduling any hearings, Plaintiff moved forward with discovery, including the completion of Prof. Paul Black's deposition. Plaintiff's inclusion of such allegations do not go to its *Daubert* challenge, are irrelevant and should be stricken.

– as the " 'splat-everything-against-the-wall-and-see-what sticks' approach" *and* "scattershot, include-every-argument-under-the-sun tactics." *Ward v. Carnival Corp.*, 2019 WL 1228063, *1, *8 (S.D. Fla. March 14, 2019). B+E submits that Plaintiff has **not** set forth any legally and factually sufficient grounds warranting the requested exclusion of Prof. Paul S. Black's qualified, timely and reliable expert opinions that will undoubtedly assist this Court as fact-finder. Therefore, this Court should **deny** Plaintiff's challenge in its entirety.

## II.  BACKGROUND AND PROCEDURAL HISTORY

1. This action arises from Plaintiff's allegations that B+E (his former employer, a real estate brokerage firm) did not fully pay him certain real estate commissions on particular transactions. [D.E. 38] In response, B+E denied these allegations, asserted affirmative defenses and also counterclaimed relative to one of the deals at issue. [D.E. 39]

2. The heart of this case turns on the parties disagreement over the plain language of Plaintiff's employment agreement. While B+E contended that Plaintiff's employment agreement clearly and unambiguously set forth that B+E's policies and procedures were incorporated therein and that Plaintiff's employment at B+E was subject to and governed by his employment agreement and B+Es policies and procedures [D.E. 48-50, 53, 67], Plaintiff illogically asserted that *only portions* of his employment agreement were applicable and that none of B+Es policies and procedures were enforceable against him. [D.E. 46, 47, 55, 59, 62].

3. In response to Plaintiff's allegations, B+E also retained an expert in Prof. Paul S. Black: a trial experienced expert witness – testified in state and federal court matters, who has not only been employed in the commercial real estate sector for more than 40 years, but who has also been a licensed real estate broker since 1988. In addition, Prof. Black has served as a lecturer (University of Miami) an adjunct professor of real estate at the collegiate level for over 20 years (Florida International University), and also during this time worked as a review editor for a publisher on several real estate textbooks. *See* Prof. Black's Deposition Transcript attached hereto as **Exhibit "A"**, plus the exhibits attached thereto as Exhibit 1, Exhibit 2, etc.

4. Per the Court's required disclosures, B+E further advised Plaintiff that "Due to pending depositions and ongoing discovery, Prof. Black has not yet finalized his opinions. His preliminary opinions are as follows," within a reasonable degree of certainty as to the commercial real estate industry:

> 1. It is customary industry practice, usually negotiated and made part of an agreement, in the commercial real estate industry, that commissions are split between the employer brokerage firm and the brokers/salespersons/agent who worked on a given transaction. The split is typically fifty percent (50%) of the commission being paid to the brokerage firm with the remaining balance of the commission being paid to the brokers/salespersons/agents who have worked on the transaction.
> 2. It is customary industry practice in the commercial real estate industry to pay the employer brokerage firm fifty percent (50%) and to pay the balance of the commission to those brokers/salespersons/agent who worked on the transaction, even if some or all of those individuals are principals of the brokerage firm.
> 3. It is customary industry practice that the principles embodied by the factors included in B+E's policies and procedures entitled "4 Stages of the Sales Process" and "Scorecarding" are standard in order to receive a commission, irrespective of how these principles are so defined by a company.

    4. B+E's policy and procedure, requiring a licensed broker or broker associate/salespersons/agents to be employed by in order to receive a commission, constitutes a customary industry practice in the commercial real estate industry.

    5. It is customary industry practice in the commercial real estate industry and part of the regulatory laws that a broker/salesperson/agent cannot be paid for any work, including a commission, if he/she is not licensed when the commission is received and becomes available for disbursement.

*See* **Exhibit A** at Exhibit 1.

    5.    Furthermore, B+E advised Plaintiff that "Prof. Black's opinions have been and shall be based upon his knowledge, training and experience, along with his review of Plaintiff's Supplemental Complaint with exhibits [D.E. 38]; Defendant's Answer, Affirmative Defenses and Counterclaim with exhibits [D.E. 39]; Plaintiff's Answer to Defendant's Supplemental Answer and Reply to Counterclaim [D.E. 41]; Summary of Facts with pertinent documents enclosed (*i.e.* Mr. Zimmerman's Employment Agreement; Excerpts from B+E's Broker Training Manual; Excerpts from B+E's Broker Policy and Procedures Manual; Email (Dated April 22-23, 2019));[2] Email (dated December 18, 2019); and, the anticipated deposition testimony of the [] witnesses." *See* **Exhibit A** at Exhibit 1.

    6.    In anticipation of Prof. Black's deposition and pursuant to the corresponding subpoena *duces tecum* served by Plaintiff on Prof. Black, he, through

---

[2] *See* **Exhibit A at** 185:5-186:18 and Exhibit 2 (Prof. Black agreed that the Summary of Facts were requested and reviewed in order to provide a context or background for him, but that his opinions on customary industry practice in the commercial real estate industry and report were based upon his training, education and experience.).

undersigned counsel, produced the exhibits in support of his aforementioned opinions on February 25, 2021. *See* Exhibit A at Exhibit 3.

7. On February 26, 2021, Plaintiff's counsel completed Mr. Black's deposition, which lasted approximately 7.4 hours.

8. Plaintiff's motion in limine to exclude the testimony of Defendant's expert witness [D.E. 73] attacked: (a) Prof. Black's qualifications for offering opinions on customary industry practice in the commercial real estate industry; (b) Prof. Black's methodology for offering opinions on customary industry practice in the commercial real estate industry; (c) Prof. Black's opinions as not assisting the Court understand the customary industry practice in the commercial real estate industry; and, (d) Prof. Black's testimony relative to the development of customary industry practice in the commercial real estate industry in view of corresponding Florida Statutes.

### III.   ARGUMENT

**A.   The *Daubert* Standard**

While this Court has broad discretion in deciding to admit or exclude expert testimony, *see General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), "[a] district court's gatekeeper role 'is ***not intended*** to supplant the adversary system or the role of the jury.' " *Id*. (emphasis added) (citations omitted). "Quite the contrary, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " *Id*. (*quoting Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993)); *see also Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296,

1306 (11th Cir. 2014) ("As gatekeeper for the expert evidence presented . . . the judge 'must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.' ") (*quoting Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)).

To evaluate the "reliability" of an expert opinion, a trial court may consider any of the four factors *Daubert* identified to guide judges in assessing reliability:

> (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and, (4) whether the technique has been generally accepted in the relevant scientific community.

*United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341 (11th Cir. 2013) (per curiam) (*citing Daubert*, 509 U.S. at 593-94); *see Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014).

Importantly, the aforementioned factors are **not** "a definitive checklist or test," *Daubert*, 509 U.S. at 593, but are *Daubert* considerations "applied in case-specific evidentiary circumstances," *U.S. v. Brown*, 415 F.3d 1257, 1266 (11th Cir. 2005). Additionally, this list is **not** exhaustive and district courts "have substantial discretion in deciding how to test an expert's reliability." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005). Stated differently, "these factors do ***not*** exhaust the universe of considerations that may bear on the reliability of a given expert opinion, and a federal court should consider any additional factors that may advance its Rule 702 analysis."

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (emphasis added). In fact, the Supreme Court made clear in its *Daubert* opinion that the foregoing factors were not to be rigidly applied, but were instead to serve as guidelines for federal district courts applying Rule 702.  *See Brown*, 415 F.3d at 1267. In fact, the Supreme Court in *Daubert* specifically stated that "***the inquiry envisioned by Rule 702 is, we emphasize, a flexible one***." *Daubert*, 509 U.S. at 594 (emphasis added).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court elaborated on the flexible nature of the inquiry, pointing out that "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141.  Rather, "a trial court ***may*** consider one or more of the specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id*. (emphasis added).  Whether the *Daubert* factors are even pertinent to assessing reliability in a given case will "depend[] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. at 150; *Brown*, 415 F.3d at 1268. Because the applicability of the *Daubert* factors depends on the individual facts in a particular case, the Supreme Court said that it could "neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor [could it] now do so for subsets of cases categorized by category of expert or by kind of evidence.  Too much depends upon the particular circumstances of the particular case at issue." *Kumho Tire*, 526 U.S. at 150.  Indeed, as the Eleventh Circuit explained, "[t]his means that expert testimony that does not

meet all or most of the *Daubert* factors may sometimes be admissible." *Brown*, 415 F.3d at 1268.

Simply put, the admissibility standard for expert testimony is a "liberal one," and a "review of the case law after *Daubert* shows that the rejection of expert testimony is the *exception* rather than the rule." *U.S. v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (citations omitted) (emphasis added). Unless an expert's testimony is so "fundamentally unreliable that it can offer no assistance . . . the factual basis of the testimony goes to the weight of the evidence." *Larson v. Kempker*, 414 F.3d 936, 940-41 (8th Cir. 2005). Finally, "The Court must be careful not to conflate questions of admissibility of expert testimony with the weight appropriately to be accorded to such testimony by the fact finder." *In re Trasylol Prods. Liab. Litig.*, 2010 WL 1489793, at *7 (S.D. Fla. Feb. 24, 2010).

**B.  Prof. Black is Qualified to Offer Opinions Relative to Customary Industry Practice as to the Commercial Real Estate Industry**

The determination of whether a witness is qualified to testify as an expert "requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony" and ascertain whether the expert can testify competently regarding the matters he or she intends to address. *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (internal quotation and citation omitted). Determining an expert's qualifications is not a stringent inquiry, "and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision*

*I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009); *see Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (expert "not necessarily unqualified simply because her experience does not precisely match the matter at hand").

In this case, the record contains unrefuted facts negating Plaintiff's bold (*and without citing any supporting legal authority*) statements that Prof. Black "has no expertise or experience whatsoever in the field of commercial real estate brokerage . . ." and "[t]here is absolutely nothing in [Prof.] Black's background or experience to suggest that he has knowledge, much less expertise, regarding the customary practices of the commercial real estate brokerage industry with respect to commissions or regarding any 'customary' policies and procedures." [D.E. 73 at pp. 4, 13]

In contrast, Prof. Black is a trial experienced expert witness (**Exhibit A** at pp. 49-66, 189-190 and Exhibit 1), who has not only been employed in the commercial real estate sector for more than 40 years (**Exhibit A** at pp. 37-45, 188-189 and Exhibit 1), but has also been a licensed real estate broker since 1988 (**Exhibit A** at pp. 25, 40 and Exhibit 1). Furthermore, Prof. Black has served as an adjunct professor of real estate at the collegiate level for over 20 years (**Exhibit A** pp. 47-49, 187-191 and Exhibit 1) and has worked as a review editor for a publisher of several real estate textbooks (**Exhibit A** pp. 51, 187-191 and Exhibit 1). Additionally, Prof. Black has operated since 2001 his own real estate litigation consulting service, providing expert opinions on a variety of real estate topics. **Exhibit A** at pp. 42-43, 186-191 and Ex. 1.

Under this case's facts and circumstances, B+E submits that based upon Prof. Black's education, training, knowledge and experience, he is qualified to opine on customary industry practices in the commercial real estate industry.

### C. Prof. Black's Methodology for Offering Opinions on Customary Industry Practice in the Commercial Real Estate Industry Were Reliable

A litigant's arguments attacking the expert's methodology based on his/her failure to consider specific factors often bear on the weight, not the reliability, of the methodology. *Holderbaum v. Carnival Corp.*, 2015 WL 12781271, at *9-10 (S.D. Fla. Aug. 19, 2015) (finding argument that vocational rehabilitation expert's testimony was unreliable as the expert did not consider specific information in her analysis bears on the weight, not admissibility, of the expert's opinion); *Perau v. Barnett Outdoors, LLC*, 2019 WL 2145513, *3-4 (M.D. Fla. Apr. 24, 2019) (holding that while expert did not test alternative design, the expert's "observations and examinations . . . support a finding that the opinion is sufficiently reliable"). Such arguments are appropriate for cross-examination of the expert because "[t]he weight to be given to admissible expert testimony is a matter for the jury." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 990 (11th Cir. 2016).

Analogously, the traditional methodology used in arriving at medical opinions includes consideration of plaintiff's medical history and other probable factors causing her symptoms. *See Galarza v. Carnival Corp.*, 2016 WL 7507883, at *6 (S.D. Fla Aug. 8, 2016) (medical expert's consideration of plaintiff's medical history and other probable factors causing her symptoms was a methodology that satisfied *Daubert*)

Case 8:20-cv-00948-CPT   Document 86   Filed 06/18/21   Page 11 of 20 PageID 1721

Case No. 8:20-cv-00948-KKM-CPT

(citation omitted); *Horrillo v. Cook Inc.*, 2014 WL 2708498, at *3 (S.D. Fla. June 6, 2014), *judgment aff'd*, 664 F. App'x 874 (11th Cir. 2016) (denying defendant's motion in limine to preclude testimony of plaintiff's interventional radiologist expert because "under more flexible *Daubert* standard . . . Plaintiff successfully met burden of establishing admissibility of expert testimony on medical causation").[3]

In the instant matter, Prof. Black's methodology was reliable and this Court should **deny** the entirety of Plaintiff's motion in limine. And in pertinent part, Prof. Black's testimony included:

> Q: Yes. So you submitted the report that's marked as Black Exhibit 1 on January 21, correct?
> A: Correct.
> Q: And then approximately five days ago you completed a document that is called "Exhibits in Support of Opinions," correct?
> A: Yes. I was continuously sending articles to Mr. Ackerman throughout that time period. As I would find articles in support of my opinions, I would them to be formatted. I don't have the capability of formatting a report such as this, so I would sent articles up to Mr. Ackerman's office.
> Q: Okay. And how did you located those articles?
> A: Well, I have a research assistant who's excellent at doing this type of work. She is a sales associate. And I, myself, did research. Between the two of us we found these articles. I referred to the textbook I use in my teaching. Other textbooks. We contacted a number of sources. The Miami Association of Realtors, Florida Association of Realtors, National Association of Realtors. We contacted the ULI. I'm not saying - - we didn't get much information from the ULI. But we contacted a number of real estate data sources and we located these articles which

---

[3] *Horrillo*, 2014 WL 2708498, at *3: Although expert could not list a specific piece of literature to support his theory that a drop in blood pressure can cause a patient to suffer a stroke, court found that he was "still qualified to render this opinion at trial in light of his substantial experience in personally performing the very procedure that decedent underwent prior to her stroke," his methodology was reliable, and expert's testimony would "assist trier of fact through application of his expertise to understand evidence or determine a fact in evidence."

supported my opinion.
Q: Did you do some Googling online in order to find any of these articles?
A: Yes.
Q: Is there anything else you've testified to - - any other information that you relief upon beyond what you just testified to in connection with the preparation of the exhibits in support of your opinion?
A: My associate spoke to her broker just to confirm some information. She spoke to other people. All she did was talk to a few people and researched articles, and I researched articles.
**Exhibit A** at 22:23-24:7.

Q: Now, when you formed your opinion and prepared the report for Exhibit 1, is your opinion based on your training, education and experience, as outlined in this deposition and as outlined in your resume?
A: Yes.
Q: And that education, training and experience would be the – would include your schooling, your initial schooling, which would have a bearing on some of these issues; isn't that true?
A: Yes.
Q: Okay. Your studying at the Real Estate Institute; is that true?
A: Yes.
Q: The years of – would it also have been based on the years of teaching at the University of Miami and Florida International University?
A: Absolutely.
Q: Okay. And as your role as a teacher and a professor, not only in the courses you taught, but in the course of preparing for those classes, would you come to understand what customary industry practices as it relates to the topics you were asked to give opinions on?
A: Certainly.
**Exhibit A** at 186:14-187:15

Q: In the various employments that you described earlier in your deposition and that are listed on your resume for your employment history, particularly AREEA, did you come to understand and develop a knowledge as to what industry practices were as it relates to the five opinions you gave?
A: Certainly. Yes.
Q: Okay. And specifically the business of AREEA. Did involve brokerage activities, correct?
A: Yes it did.
Q: And then you also have consulted on a number of cases, you specifically went through the details of eight of them that involved

commission disputes; is that correct?
A: Yes. There were five of them, yes.
Q: I'm sorry. And during the course of researching and preparing your deposition for your testimony and rendering of opinions in those cases, did you develop your base of knowledge and understanding as to what industry practices are in the real estate brokerage industry as it relate to the opinions you've rendered?
A: Yes. It certainly contributed to my base of knowledge, sure.
Q: [] Do you receive and review publications on a regular basis about what is going on in the real estate brokerage industry?
A: Yes. Being licensed broker my name is on all the lists of companies that send out information to brokers.
Q: All right. And do those publications and information often deal with what is going on in the industry as it relates to the areas that you're rendering opinions?
A: Yes. Yes, it does.
Q: And would those, keeping up with what's going on in the industry, form the basis of your education, training and experience for the opinions you've rendered?
A: Yes. Keeping on up on the industry is required by the university.
Q: Okay. And I may have asked you this, and your opinions are to a reasonable certainty in your field?
A: Absolutely.
Q: Now, you went ahead and located articles that form the basis of - - I forget which exhibit it is, something called your exhibits for opinions; is that correct?
A: That's correct.
Q: Okay. Now, has your initial opinions changed or been modified in any way based upon the exhibits that you used to support your opinions?
A: No.
Q: Okay. Are the articles that you selected reflective of the industry practice to which you've referred to as your opinions?
A: Absolutely.
Q: Is it possible and do you know whether the articles, each article deals exactly with what you are attempting to state as your opinion?
A: No. The sum total of the articles present the picture. You're not going to find one article that deals with triple net lease deals, but as a total it does discuss and indicate to me what typical industry standards are.
Q: And they reflect what you've said as your opinions here today and in your initial disclosure, correct?
A: That's correct. That's correct.
**Exhibit A**

at 188:24-192:7

Similar to the authorities cited above – which demonstrated the flexible *Daubert* standard as applied in the Eleventh Circuit and this Court, Prof. Black's methodology met the burden of establishing the admissibility of his aforementioned opinions on customary industry practice in the commercial real estate industry. To explain, Prof. Black not only relied upon his training and education, but also his professional and teaching experience as described above, and also sought out publications and secondary sources, as well as spoke with contemporaries with respect to his opinions. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data . . . that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). Plaintiff's attack on Prof. Black's "Googling" in support of corroborating his opinions on customary industry standard in the commercial real estate industry is specious given that customary industry standards are not memorialized anywhere. The fact that Prof. Black found so many articles and secondary sources supporting his opinions via the Google search engine speaks much more-so to the reliability of his opinions as opposed to unreliability of his methodology.[4] Regardless, even after completing all of the

---

[4] *Distinguishably Eli Research, LLC v. Must Have Info, Inc.*, 2015 WL 5254300, at *3 (M.D. Fla. Sep. 9, 2015) (court struck expert's opinions because her research into trade secrets involved only looking up term "trade secret" on Google, and admitting that her opinions were basically her guess as to what a trade secret is or is not, as opposed to Prof. Black's opinions being corroborated by internet research derived from the Google search engine.).

aforementioned due diligence (*i.e.* not just relying upon articles and secondary sources generated from the Google search engine), Prof. Black confirmed that his aforementioned timely disclosed opinions (January 21, 2021) remain unchanged.

At its bottom-line, Plaintiff's arguments are the proper subject for cross-examination because the Eleventh Circuit and other Florida District Courts have repeatedly stated that the soundness of an expert's factual predicate, including methodology relied upon, goes "to the weight and credibility of his testimony, not to its admissibility." *Sorrels v. NCL (Bahamas), Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015); *Ward*, 2019 WL 1228063, at *6-7 (plaintiff's criticisms "are more appropriate at trial and upon cross examination, as any such objections go to the *weight* of the evidence rather than its admissibility . . . "attack on the 'factual underpinnings' of [an expert's] ultimate conclusions . . . goes to weight and credibility of expert's testimony, not to its admissibility.")[5] (emphasis added); *Carideo v. Whet Travel, Inc.*, 2018 WL 1367444, *10-

---

[5] *See also Hightower v. Goldberg*, 2018 WL 296955, at *2 (M.D. Ga. Jan. 4, 2018) ("Defendants' objections go to the weight and credibility of Mr. Beauchamp's opinions, not their reliability. If Mr. Beauchamp failed to consider certain facts in forming his opinions, Defendants will be able to vigorously cross examine him, present their own expert testimony, and tell the jury why they believe his opinion should not be believed."); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *6 (E.D. Pa. July 29, 2015) ("Courts have found that most contentions that [an expert's] assumptions are unfounded go to weight, not admissibility, of testimony, and a district court has discretion ... to determine whether expert acted reasonably in making assumptions of fact upon which he would base his testimony.") (internal quotation marks and citation omitted); *Mcgarity v. FM Carriers, Inc.*, 2012 WL 1028593, at *7 (S.D. Ga. Mar. 26, 2012) ("[I]dentification of flawed data or facts relied upon by an expert is precisely the role of cross-examination and does not render expert testimony inadmissible under *Daubert*.").

11 (S.D. Fla. Mar. 16, 2018) ("Mistakes, defects, omissions, problems, and weaknesses with an expert's opinion do not necessarily mean that it must be *excluded* . . . [goes to] *weight* of expert's opinions [and should be] addressed at trial through vigorous cross-examination . . . Court is compelled to stress that a less-than-perfect expert opinion may still be admitted, even if it contains gaps.") (emphasis added); *Acevedo v. NCL (Bahamas) Ltd.*, 317 F. Supp. 3d 1188, 1197 (S.D. Fla. 2017); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) (same as above); *Ward*, 2019 WL 1228063, at *11 (argument that expert failed to rule out pre-existing conditions was "more appropriate for cross-examination").

Given the foregoing, this Court should find that Prof. Black's methodology was sufficiently reliable, based upon this case's facts and circumstances, and therefore, Plaintiff's motion should be denied, such that Plaintiff should attack these purported weaknesses via cross-examination at trial.

### D. Prof. Black's Opinions on Customary Industry Practice in the Commercial Real Estate Industry Will Assist This Court

As prefaced above, the admissibility standard for expert testimony is a "liberal one," and a "review of the case law after *Daubert* shows that the rejection of expert testimony is the *exception* rather than the rule." *U.S. v. Frazier*, 387 F.3d at 1259 (emphasis added), and unless an expert's testimony is so "fundamentally unreliable that it can offer no assistance . . . the factual basis of the testimony goes to the weight of the evidence." *Kempker*, 414 F.3d at 940-41 (8th Cir. 2005).

Contrary to Plaintiff's unsupported, three sentence position that Prof. Black's opinions will not assist this Court because "All the 'expert' is going to do is parrot the argument that Defendant's counsel might make," insults not only Prof. Black's significant expertise and ability to testify truthfully, accurately and based upon his training and education, professional and teaching experience, but also , but also makes no sense given that Prof. Black's opinions remained unchanged even after he disclosed same and subsequently reviewed various publications and secondary sources and spoke with contemporaries in the commercial real estate industry.  In light of this Court's liberal admissibility standard, Plaintiff has not shown that Prof. Black's opinions were "so fundamentally unreliable that [they] can offer no assistance," particularly given the facts and circumstances of this case.  Therefore, this Court should deny the entirety of Plaintiff's motion in limine.

**E.   Prof. Black's Testimony on the Interplay Between Customary Industry Practice in the Commercial Real Estate Industry and Florida Law Should Be Permitted**

Lastly, Plaintiff contended that to the extent Prof. Black's fourth and fifth opinions and related testimony were impermissibly opining on the law.  [D.E. 73]  However, this position similarly lacks merit and Prof. Black's opinions and testimony should not be stricken.  Prof. Black's fourth and opinions set forth that:

> 4. B+E's policy and procedure, requiring a licensed broker or broker associate/salespersons/agents to be employed in order to receive a commission, constitutes a customary industry practice in the commercial real estate industry.
>
> 5. It is customary industry practice in the commercial real estate industry and part of the regulatory laws that a broker/salesperson/agent cannot

> be paid for any work, including a commission, if he/she is not licensed when the commission is received and becomes available for disbursement.

*See* **Exhibit A**.  At deposition, Prof. Black's testified as follows:

> Q: Okay.  Now is it also true that as part of your classes and customary industry practices, you develop and have an understanding of some basic principles relating to real estate broker law, correct?
> A: Correct.
> Q: And is it your understanding that customary practices can and often are based on what the law is - - is that correct?
> A: Oh, absolutely.
> Q: And why is that?
> A: Well, because if your customs and practices are outside the law, you have a problem.  I think the law sets the guidelines under which customary practices would prevail.
> **Exhibit A** at 187:16-188:7.
>
> Q: [] Why was it important for you, for these opinions, to put in what the Florida Statutes are as a basis for an opinion on customary practices?
> A: Well, in my opinion, the Statutes form what's customarily done.  You can't violate the Statutes, and that that to me is what should shape all policies and guidelines and industry standards.
> Q: And would it be industry standard for an opinion that a sales associate, salesperson have to be employed at B+E, B+E or any other company, to receive a commission?  Because what happens if they're a sales associate and they leave?  What happens in terms of paying a commission?
> A: If your license is not active and you're with another broker, they're not entitled to a commission.
> Q: Okay.  Is there any way to know in advance of their leaving, whether they're going to end up putting their license - - if they're a sales associate, is there any way that the broker employer's going to know whether they're going to keep the license active, whether they're going to go to another broker at the time they leave?
> A: There's no way of knowing that.
> Q: Would that be a reason or a basis because of those Statutes to have that policy so that the company would not be at risk of having to pay someone that's not licensed at the time they depart - - is that correct?
> A: That's correct.
> Q: Okay.  Is it also your understanding that the deals that were involved in this case, that no brokerage commission would be paid unless there

> was an actual closing; is that correct?
> A: That is correct.
> Q: Would that be another basis for the policy that someone would need to be employed at the time to receive the commission?
> Q: In other words, if they're not there when it closes, it that a basis for that customary policy?
> A: Sure.

*See* **Exhibit A** at 198:20-200:17.

An expert witness cannot offer legal conclusions; only the Court may instruct the jury as to the state of the law. *Montgomery v. Aetna Cas. & Sur. Co.*, F. 2d 1537, 1541 (11th Cir. 1990); *Legg v. Voice Media Group, Inc.*, 2014 WL 1767097, at *4 (S.D. Fla. May 2, 2014) ("Where an expert offers an opinion as to legal implications of facts, testimony encroaches on responsibilities of the judge and jury, and is inadmissible.").

Differentiating from *Montgomery*[6] and *Legg*,[7] Prof. Black has not offered a legal conclusion on any issues, but instead offered how the customary industry practice in the commercial real estate industry as to his fourth and fifth opinions were the result of the parameters set forth in Florida Statutes and applicable regulatory law—*i.e.* neither Prof. Black's opinions nor his testimony usurped the Court's providence over the law. Therefore, Prof. Black's fourth and fifth opinions and related testimony should not be stricken and Plaintiff's motion in limine should be denied.

---

[6] The court held that where the expert testified that Aetna had a duty to hire tax counsel, the court found that to be a legal conclusion that should have not been admitted. *Montgomery*, F. 2d at 1541.

[7] The court held that where expert intended to testify that the systems VMG used to send its text messages met the legal definition of an automatic telephone dialing, such testimony implicitly constituted the expert's conclusion as to the legal definition of an automated telephone dialing system, and was therefore inadmissible.

Case No. 8:20-cv-00948-KKM-CPT

Dated: this 18th day of June, 2021.

Respectfully submitted,

*/s/ Joseph L. Ackerman, Jr.*
Joseph L. Ackerman, Jr.
Fla. Bar No. 235954
Email: jackerman@fowler-white.com

Andrew G. Tuttle
Fla. Bar No. 118467
Email: atuttle@fowler-white.com

FOWLER WHITE BURNETT, P.A.
Northbridge Centre
515 North Flagler Drive, Suite 2100
West Palm Beach, Florida 33401
Telephone: (561) 802-9044
Facsimile:  (561) 802-9976

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 18th day of June, 2021, a true and correct copy of the foregoing was served upon the following parties via email.

| | |
|---|---|
| Lloyd S. Clareman, Esq.<br>lloyd.clareman@clareman.com<br>121 East 61st Street, 2nd Floor<br>New York, New York 10065<br><br>*Attorneys for Plaintiff* | Robert K. Jamieson, Esq.<br>rjamieson@guerraking.com<br>Guerra King P.A.<br>5505 West Gray Street<br>Tampa, FL 33609<br>(813)347-5510 |

*/s/ Joseph L. Ackerman, Jr.*
Joseph L. Ackerman, Jr.